3-4 Rudolph v. Camtek. Mr. Brumberg, please proceed. Good morning, Your Honors, and may it please the Court, I'd like to reserve five minutes for rebuttal. When this case was previously before the Court in 2011, it held that the District Court had misconstrued the terms of wafer and plurality of wafers, and it adopted a narrower construction of both terms. This was not a trivial ruling. The word wafer is at the foundation of both of the claims at issue in this case, and by narrowing the construction of that claim, this Court substantially narrowed the scope of the claims. The District Court failed to recognize this, and it reinstated on summary judgment the infringement ruling that this Court had vacated. When you say this was not a minor ruling, that's because at the time you told us that it did have a specific and relatively dramatic effect on infringement, and yet you went back and had an opportunity to present your evidence of infringement, and it turned out that the change in the construction didn't really matter. It didn't matter because the District Court basically turned this Court's rationale on its head. Remember, the issue before was whether the District Court was correct in saying that a wafer can be two dyes, and essentially that all it is is a multiple number of dyes. Now, we made two arguments in response to that. We said, first of all, that a wafer is a discrete object, and therefore you can't divide up a single wafer into notional dyes. But we said that you could. What's that? We said that one dye could be a wafer. Yes. But what this Court also recognized is that there's a distinction in the patent between dyes and wafers. This Court recognized that in the description of the preferred embodiment, the specification distinguishes between wafer training and dye training. And even more importantly, it recognized that Claim 10 of the parent patent describes a device for inspecting substrata. That is for inspecting dyes on substrata. Now, that's a dye inspection device. The patents here are for inspecting substrata. That is for wafer inspection. And the undisputed evidence below showed that the Falcon machine that's at issue here is a dye inspection machine. Our expert, Mr. Meller, this is on page 6717 of the appendix, testified that the Falcon machine only inspects dyes, and it doesn't look at the other features of a wafer, such as the streets or the edge. And it develops a model solely of the dye. It doesn't look at the other features, but it uses wafers for the inspection process. And your expert conceded that. It does, Your Honor. But the question is, what's the scope of the patent here? And these claims here are for inspection of a substrata. They're not for inspection of a dye on substrata. That's Claim 10 of the parent patent. This claim must be for something else. And the something else is a wafer in all of its aspects, not just the dyes. But we didn't say that. We had a very specific claim construction that included the fact that a wafer could constitute a single dye. I think what the Court said is that a wafer that includes a single dye may be a wafer. But that doesn't mean that the dye is the only thing that you look at on the wafer. And that's really what the issue is here. And this Court, as I said on page 1258, recognized that there's a distinction. We didn't say the dye isn't the only thing you look at on the wafer. What we said was a plurality of wafers means more than one wafer. But we didn't say that's because you look at other characteristics of the wafer in the process of forming a model. We just said a plurality of wafers requires more than one. Your Honor, I'm not going to argue with you about that. A group of people is not a single individual. That's all we said. That was the only holding that was at issue in that case. That's all we said. Well, I'm not going to argue with you, Your Honor, about what the holding was. But what the Court recognized is that the specification distinguishes between wafers and dyes. If you look at page 1258- Well, the specification distinguishes between wafers and dyes with regard to the only issue presented to the Court, which is two dyes on a single wafer don't amount to a plurality of wafers. That amounts to two dyes on a single wafer. That's not a plurality of wafers. I think if we set aside what this Court ruled and look only at the specification, what the specification says is that you can input either wafers or dyes. It talks about a plurality of known good dye or wafers. So it's making a distinction between dyes and wafers. And even more sharply, that distinction is made in claim number 10. We remanded for the sole purpose of infringement taking place using a plurality of wafers. That's it. That's what we told the Court to do, and that's what he did. So I don't understand what- You now want to reopen the entire case somehow, but that's not where we are at this phase. Well, Your Honor, I don't think we want to reopen the entire case. What we want to make sure is that the ruling that's here is consistent with this Court's construction of the term wafers and consistent with the fact that there is a distinction between wafers and dyes in the patent. No, you lost once. You come up and you give us a very specific set of issues on appeal. Right. And we rule on those issues. And now you go down and you're coming up with a whole different notion of what the claims mean, a whole different non-infringement theory, and that wasn't available to you. Your Honor, I would beg to differ because, as you recall, and you can see from our briefs that were previously filed, we had two theories. One was that wafers are discrete objects. That was one of our theories. But our second theory was that the patent draws a distinction between dyes and wafers. And that part of our argument, which I think this Court's- which I thought this Court's discussion on page 1285 confirmed, that's the part that the district court didn't understand, because what the district court said was a dye is a wafer, and therefore there is no distinction between a wafer model- No, that's not what the district court said. The district court said exactly what we said, which is that a wafer has to be an independent object, but it could have only a single dye on it. And that's what the district court said. Right. And that's exactly what we said. But the question is whether a wafer model is the same as a dye model. And that's clearly presented by claim number 10 of the parent patent, because that is a method for inspecting dye on substrata. What we have here, claim number 1, is a system for inspecting substrata. So there has to be a difference between inspecting dye on a substrata and substrata. And the difference is that there are other aspects to a substrata than just the dye. And those aspects are not captured by the foundation. Well, let's just assume that we think you're foreclosed from making those arguments. Right. Because we think the remand was clear, we think that the only argument you were permitted on remand was to argue about whether or not the accused infringing devices use a plurality of wafers in order to create a model. Right. So let's assume that we think the district court did all of that exactly right. Do you have any other arguments for us today? Yes, and I think you characterized the issue correctly, and that's whether multiple wafers are used to create a model. And the evidence that was presented was that multiple wafers are used in training. They're used in the inspection parameters. Now, inspection parameters are the fine-tuning of the model. What about the adjust-to-gold? The adjust-to-gold deals with the inspection parameters. And again... It uses multiple wafers. It uses multiple wafers, but it doesn't use it to make the model. What it uses is for adjusting the inspection parameters. And if you look at the specification on columns 12 and 13 and 14, you'll see that there is a distinction between the two. Well, claim 3 states pretty clearly that it's training a model as two parameters of a good wafer via optical viewing of multiple known good wafers. But claim 1 doesn't actually say that. It just says it doesn't say anything about a model at all. It doesn't even use those words. It says a visual inspection device for visually inputting a plurality of known good wafers during training. That's quite a bit broader than claim 3. To the extent that I described it as forming a model, no doubt that was informed by my knowledge of claim 3 and the specification. But claim 1 doesn't say that. Right. But claim 1 was also construed. The term training was construed by the trial court to be examining wafers to develop a model of a good quality wafer. So it was construed to be the same and to say that you have to be construing the model. You have to be using a plurality of wafers to develop the model. But you didn't appeal the training construction the first time around. Why should we reopen everything? We're not reopening that. I'm actually relying upon that. I'm saying that claim 1 was construed to have training of the model just as claim 3 literally does. And the testimony that was presented below was the use of multiple wafers in creating inspection parameters, which is a different step in the training process. It's the fine-tuning of the model. Boy, that sounds awfully fact-specific. It is fact-specific, Your Honor. Let me ask you a little law question. Yes. You're arguing that the district court erred in applying what you call a punitive 10 percent statutory interest rate. Yes. And you reference General Mills v. Five Star Custom Foods for the proposition that Minnesota, before August 2009, used the one-year Treasury bill, right? Right. So you're familiar with the case? Yes, Your Honor. Okay. So in that case, the district court says the statute's text is abundantly clear. Had the Minnesota legislature intended for different prejudgment interest rates to apply to damages incurred before and after August 1, 2009, it could have easily said so. The court will not ignore what it believes is the Minnesota legislature's clear mandate. Thus, the court determined that so given the court's determination and your citation of that case, why should we veer away from it? Well, I think the problem is that the 10 percent rate is not a compensatory rate. The Minnesota statute has two tiers to it. It has a tier which is based upon the Treasury rate for most judgments, and then it has the 10 percent rate, which is for judgments above $50,000. Now, the Treasury rate is traditionally the compensatory interest rate. The 10 percent rate, we don't know why the Minnesota legislature adopted that. There's no legislative history on it. I haven't seen any case law on it. But it's clearly greater than the compensatory rate. And under this court's decision in Bio-Red and the Supreme Court's decision in Debex, it's improper to use a non-compensatory rate. Are you arguing that the, because I don't see this, are you arguing the Minnesota statute is unconstitutional? No, it's not unconstitutional, but it's not compensatory. And noticeably absent from Rudolph's brief is any attempt to show that this 10 percent rate is compensatory. But let me point out one other thing that I think may not have been as clear as should be about the prejudgment interest. The original prejudgment interest that was awarded through the judgment in 2011, that was $1.2 million. This was remanded to the district court. The district court used a different methodology on remand. It used the 10 percent rate not just for the period in which it had been used previously, but it expanded it for the entire period. And that's what General Mills says. And that expanded what had previously been $1.2 million for the period to $3 million. Now how that could be compensatory is beyond me, Your Honor. And the fact that we have a $7 million prejudgment interest, which is approximately equal to the amount of the judgment here, which was expanded by $3 million after this court remanded, I would submit is improper. It's clearly not a compensatory rate. I'd like to talk just briefly about the damages issue. You're into your rebuttal time. We have two minutes left to use if you'd like. I'd just like to say two problems with the damages. First of all, there's no showing that there was any evidence justifying the amount that the jury awarded, the 60 percent amount. And in addition, this court's narrowed claim construction raised an issue whether there was a non-infringing alternative, which was basically removing the adjust to gold feature. Thank you. I'll reserve the remainder of my time. Mr. McDonnell. Good morning, Your Honor. May it please the Court. I will start by asking the Court if they have any particular areas they want me to address first. Why don't you start where he left off with the damages issue. The damages. Okay. So we have, that's the lost profits award. And what the district court did in a very thorough analysis is it treated their request for a new trial as, in effect, a summary judgment. Can you show me a disputed material fact that would have changed the damages equation for the original lost profits award? The original award was Kantech and August slash Rudolph were the two sole suppliers in the marketplace, or at minimum were the two primary competitors with very small of their competition. There was support as the judgment. But the district court rejected your two supplier market argument. No, it actually specifically said there was support for both of those in its decision. And at pages 8-266 to 268 of the appendix, that's where Judge Davis talked about that. I believe he said that both theories were supported by the record. And we had quite a long site of exhibits as well as trial testimony in there, including things like lost sales reports by August. Over a dozen of them, I think, are listed where he says the record is that Rudolph lost the sale to Kantech over and over again. But even if we agree with Judge Davis' analysis on JMAL that the original jury award was supported by substantial evidence, the question is, is there anything that our remand did that actually narrowed the scope of infringement that would raise some question about this non-infringing alternative? Right. That's the issue that Judge Thunheim looked at. And he said nothing changed because all the same 36 falcons that were found infringing, every single one of them the first time around found to infringe on remand. Again, every single one of those found to infringe. But they may well only infringe by virtue of the adjustable feature. That may be the only reason they infringe. Now, granted, any machine, this is a machine claim, that is capable of infringing is an infringing machine. So you win on the 36 machines are still infringing. But I think the heart of the question is how easy would it have been to have manufactured a version of the machine removing the adjustable feature? It seems like it would have been pretty simple. It seems like they would have been motivated to do it because it actually slowed down the efficiency of the machine. Otherwise, one of the goals was speed. And it seems like it may have been a little used feature on top of it. And so those are all fact questions. I have no idea whether they're correct or not. It's what they allege. I'm not saying they're necessarily correct. But they are fact questions. So if that's the nature of the dispute, why didn't it have to go to a jury as to whether or may not have actually been on the market in 2009, a version of this falcon without the adjustable, but it would have been a very easy, extremely simple redesign that could have been offered as a non-infringing alternative. And that's the question. So to show that's a viable alternative, it would be relevant. They've got to show it doesn't infringe, it's acceptable, and it's available. On the infringement issue, Your Honor, they supposedly have a document from early 2012, February of 2012, right after the remand that describes this hypothetical other design. We then have supplemental discovery on remand. We asked them for any other technical documents about the falcon. They said, we have no other documents. They did not give us that document. They stipulated for purposes of infringement that every falcon works the same. That's what their expert, Dr. Meller, said in 2012. Even in his rebuttal report. Let me ask you this. Did CAMTC raise that non-infringing alternative argument prior to the issuance of the court's summary judgment decision? Not before the infringement decision, Your Honor. That was in March of 2014. We did not know that they had this purported redesign. Judge Thunheim did not know about it until after that. Even though they had stipulated that in 2012 that they would not rely on any documents regarding the operation of the falcon other than the ones that they had already produced to us. So then they went and reached that agreement by pulling out this new document after the summary judgment. That's exactly what happened here. So as Judge Thunheim found, he was not going to re-litigate the issue of whether any falcons, any of those falcons that they have, infringe or not. That was decided on summary judgment. They had their chance to put up their evidence on this alternative design. They made a conscious decision not to do so. Their expert says nothing about it. He says they're all the exact same. To be clear, I want to make sure I understand what you're saying to us, and it reconciles with what I'm reading. So what you said to us is they didn't raise it in the context of non-infringement. And that's absolutely true. It's because the judge held we're looking at a machine, and if the machine sells with an adjustable feature, it's infringing. But in 2014, cited in page 19, they had raised no later than April 2014, which is after infringement, the argument about damages, that it may not, the idea that adjustable could be a redesign, that's easy and could be a non-infringing alternative in the market, doesn't go to non-infringement because the device is sold did have it, and so therefore they are infringing. But it absolutely goes to the question of lost profit. And they raised it no later than April of 2014 with the court below, which was after he ruled on the infringement, but before he made a decision on what to do with damages. So I'm not seeing that argument as waived unless I'm misunderstanding the record. Well, here's one big part of that. If you look at Appendix 8984 to 8986, that's the part of our brief where we talk about what they didn't disclose. And in there, we point out in the record, Camtek said they would not rely on any documents not disclosed. They did not limit that assurance to the infringement issue, Your Honor. That was for any purpose. And consistent with that, their expert, Meller, in his rebuttal report on June 1st, he talks about non-infringing alternatives at Appendix 8421. And at Paragraph 162, the only non-infringing alternative he talks about is, quote, the falcon itself. He doesn't say there's this alternative design that also, or alternatively, would be yet another non-infringing alternative, number one. And if I could talk about that infringement issue just for a moment, Your Honor, the adjust to gold, there's no dispute with their expert or in the record, but the adjust to gold had to do with later amendments to the model, not the initial settlement. If they didn't know until you moved, made your motion to reinstate the same damage award, how could they have known that they needed to raise the idea of an issue that goes exclusively to lost profits, which is whether or not the falcon could be changed to have a non-infringing version of it? And then they promptly moved. They moved, I guess, at 9407 and 08 of the appendix, and you can see also the discussion on page 19 of the Gray Brief, they moved immediately and explained all of this to the district court. So why is that too little too late at that point in time? Well, they had a record right away in 2012 about their desire for a new trial on damages, and there was an initial ruling by the magistrates. And the judge said, well, let's put that on hold. Let's look at summary judgment on infringement. They did file an expert report where they talked about non-infringing alternatives in 2012 on June 1st. That's the one I was just quoting from paragraph 162. They were well aware of that issue. They were making their record, and they knew they had to be making their record. That was what was supposed to be happening. In 2012, before the summary judgment decision, what's going to be your position on why you get a new trial? Why would there be any change here? That's why they were talking. That's the only reason they'd be talking about non-infringing alternatives in that 2012 expert report. So this wasn't a new issue after the summary judgment decision. I hear what you're saying, but my problem is what you would like me to do, it seems like, is conclude they raised it too late in the process and we're not going to go back and unravel it now. The problem is they did raise it repeatedly with the district court, and I don't see where he addressed it. I don't see where he seemed to appreciate that what they were arguing is a simple redesign of the Falcon by removing the adjust to gold feature would cause it to be a non-infringing alternative, which would undermine the lost profits finding. So he didn't find, like it's easy for me to affirm a waiver decision by a district court. We do that all the time. Or for him to say it was untimely. Their argument is untimely. But he didn't do any of that. He made no findings. He seemed to have not appreciated the nature of the argument. Well, in the new trial decision, he did say we're not going to relitigate the issue of whether any Falcons infringe again. I already decided that. That's not the same issue. That's pretty close, though, Your Honor. No, not at all close. Whether a Falcon infringes is a different question about whether a Falcon can be redesigned and entered into the market as a non-infringing alternative solely for lost profits purposes. Well, they did not certainly bring that issue. And they have an extra report that says I'm going to listen on infringing alternatives, and they don't identify that one, Your Honor. I think you can't blame the judge for not considering that. Let's turn to separate from the infringing issue of adjustable, that hypothetical design. I think it's clearly, well, if we stick with infringement for just a moment, Mr. James and the evidence was during initial setup, if you look at Mr. James' declaration, that's when they used that 50-plus wafers. Dr. Meller, CAMTEC's expert, admits that adjust to gold only has to do with what he calls later steps, not initial setup. And as our experts showed, even when they brought up this purported hypothetical redesign for the new trial, even if you accept this coming out, the CAMTEC made no record that even without adjust to gold, it wouldn't be capable of being trained with multiple wafers. And it clearly would be. In fact, as Mr. James said, they didn't really use adjust to gold. That wasn't a commonly used thing. But yet for initial setup, they would use all these wafers. So that's number one on infringement. Number two, though, you still have the issues of acceptability and availability on the market. Grain processing and the Medtronic deplete case make it clear that when the alleged non-infringing alternative was not in fact on the market during the relevant damages period, there is a burden on CAMTEC as the infringer to prove it's acceptable and available. The burden is not on us. All of their briefing on this issue, though, said, oh, Rudolph hasn't met its burden to show that the alternative is not acceptable or available. We didn't have a burden. They put in absolutely no evidence on the acceptability of this alternative. Instead, the evidence is that every single customer for a Falcon, according to Mr. James, needed that model made with many, many wafers to make sure it's a really good model. No customer ever wanted to use a Falcon with a model based on just one single discrete wafer. And so all the evidence is to the contrary. But they put nothing in, even after the summary judgment, even when they're asking for a new trial. They did not proffer, they did not propose any evidence on the issue of acceptability. Wasn't there a declaration submitted by CAMTEC that without the just-to-gold feature, it would not infringe? He didn't say that it would not train without any more than one wafer. He didn't say that in his declaration, as our expert pointed out. He didn't deny that it was capable of being trained with more than one wafer, in fact, even without a just-to-gold. Our expert pointed that out on their reply. They didn't dispute that. But even apart from that, you've got the acceptability issue. There's just zero evidence of that being acceptable in the market. The burden was on them to come forward with something on summary. In effect, the judge treated it appropriately. As a summary judge, show me a material fact that you could go to trial with on a new trial on damages that we'd actually have to have a jury make a decision about. CAMTEC provided absolutely nothing. Any other questions? Again, I want to start where he left off. That is my concern. You have a very generalized statement from an expert that simply says that if you remove your just-to-gold, it would have no effect on the multiple other ways that you could do this training. But you misread grain processing. Grain processing just doesn't say there must be some theoretical non-infringing alternative. You have to at least proffer some evidence from which the trial judge could conclude that you've raised a material issue of fact on the fact that it would be an acceptable substitute and that consumers would find it to be an acceptable substitute. You didn't raise any fact. I think Mr. James' testimony provided that. Where? I don't see anything more than the general statement that I just said. No, this is in Mr. James' deposition testimony. And there he was asked about the just-to-gold feature. Cite us to the record, please. It's on pages 8885 and 8886. And we asked him, well, what consumers actually use that feature? And he only came up with one. And he said that they didn't much like that feature because it slowed down throughput. He said they used it only as a last resort. He just said, he said, yeah, you're mischaracterizing this. He said that, yes, they used it. And it says, I don't know that they used it every time or on every single product. Well, Your Honor, I think, remember, we're on summary judgment here. Okay? And the question that was asked was which customers used it. But you have to come forward with sufficient facts to raise a material issue of fact. I mean, this is part of the problem is that you stood up here the last time you were here and you all argued that this claim construction, that if we found that a plurality of wafers didn't include multiple dyes on one wafer, that there would absolutely be no infringement. And to the trial judge's surprise, you offered no evidence to that effect. In fact, all the evidence was to the contrary. I would disagree with that, Your Honor. So now you're telling us that, okay, you've got this new theory that you've never given any real evidence of except this loose statement that doesn't even say what you said it did and that we're supposed to send this back yet again? Well, Your Honor, first of all, what we're talking about here is the non-infringing alternatives. And as Judge Moore pointed out, that only goes to the question of damages, whether the lost profits were attributable to the infringement under the narrowed construction. That's an issue that wasn't raised until there was the summary judgment ruling. And we presented evidence that under the narrowed construction, there was a genuine issue as to non-infringing alternatives. Now, this evidence here, you have Mr. James saying that, yes, there were consumers who used this alternative. Then we asked him, well, which ones? And he said, well, some of them. And then said, can you name one? And he could name only one. And then if you look up on page 8886. No, it's not that he could only name one customer. He said, I just don't recall specifically. He's not saying others didn't use it. Your Honor, I think it's a question of what inference a reasonable jury could draw from that. And I think a reasonable jury could draw an inference from that that there were no other customers. And furthermore, up on page 8886, he says, this was a last resort because of the throughput hit. I looked closely at that Delphi testimony, and I certainly couldn't draw that conclusion. Your Honor, I would respectfully disagree. But I think it's also important to recognize that there was testimony that this alternative was available. There was testimony that it created a throughput hit. There was testimony that what was really attractive about the invention was the speed. And a jury could infer from that that if you took out this feature, which was slowing down the operation of the machine, that it would be more attractive, not less attractive to consumers. Also, the fact this was available, this was a software update. This was taken out by changing the software. That clearly would have been available at the time, or at least a reasonable jury could infer that. So we think that there is a damages issue here. Now, with respect to the damages that were awarded previously, Mr. McDonald has avoided citing to any evidence in the record that would support the amount of damages that was awarded. Yes, the district court did say that there was sufficient evidence. And it did cite to a lot of different transcript sites and exhibits. But it didn't explain how that shows that there was a 60 percent market share. Mr. Bromberg, we're well over your rebuttal time, so we're going to have to end here. Thank both counsel for their argument. The case is taken under submission.